STATE OF NEBRASKA, APPELLEE, V.
LEON SANDERS, JR., APPELLANT.
733 N.W.2d 197

Filed March 27, 2007. Nos. A-05-1415, A-06-523.

This opinion has been ordered permanently published by order of the Court of Appeals dated May 2, 2007.

Franklin E. Miner for appellant.

Jon Bruning, Attorney General, and George R. Love for appellee.

CARLSON, MOORE, and CASSEL, Judges.

CASSEL, Judge.

## I. INTRODUCTION

Leon Sanders, Jr., was convicted of one count of theft by shoplifting and three counts of burglary. He appeals, alleging that the district court for Lancaster County erred in denying his motions to exclude certain evidence from trial and in granting the State's motion for joinder. Sanders further alleges that he was denied the effective assistance of counsel in pretrial proceedings and at trial. We conclude that Sanders' assignments of error lack merit, and we therefore affirm.

## II. BACKGROUND

On February 27, 2005, items were stolen from four Lincoln, Nebraska, businesses. The State charged Sanders with burglary and theft in two separate informations, alleging that he was responsible for the February 27 crimes. We briefly summarize the circumstances surrounding each crime.

In the early morning hours of February 27, 2005, a break-in at the U Stop convenience store at 3747 South 27th Street was reported. The glass in the U Stop's front door was broken out. A surveillance tape recorded an individual breaking the glass out of the front door with a rock and showed him stealing cigarettes from the store. The surveillance video also captured footage of

the suspect's vehicle. The suspect was driving a blue, two-door car with what appeared to be an in-transit sticker on the vehicle's back window. After reviewing the surveillance video, an officer with the Lincoln Police Department (LPD) observed that the fourth taillight left of the right side of the vehicle was missing or burned out and determined that the suspect's vehicle was either a late-1980's Buick Somerset or a 1990 or 1991 Buick Skylark.

Village Market at 3211 South 13th Street and Williams Cleaners at 6891 A Street were also burglarized during the early morning hours of February 27, 2005. Glass in the front doors of both businesses was broken out with a rock. Cartons of cigarettes were taken from the Village Market. Gift certificates and some clothing were taken from Williams Cleaners.

A Hy-Vee grocery store was also a target. An individual entered the Hy-Vee at 6919 O Street at approximately 4 a.m. on February 27, 2005, and stole multiple cartons of cigarettes. A Hy-Vee employee on duty during the incident witnessed the theft. This employee, Marlin Pals, gave a description of the suspect and the suspect's vehicle to the police. In response, the police sent out a broadcast for a male of unknown race, standing between 5 feet 9 inches and 6 feet tall and weighing between 180 and 200 pounds. The broadcast indicated that the suspect was driving a 1990's darker Chevrolet four-door car with "in-transits."

On March 19, 2005, two LPD officers located a vehicle that matched the description of the vehicle from the U Stop burglary. They located this vehicle at an apartment complex on Arapahoe Street. After discussing the vehicle's similarities to the vehicle involved in the U Stop burglary, one officer opened the vehicle's left front door and pressed his foot on the brake pedal while the other officer observed the taillights. The observing officer noticed that one taillight was burned out or missing and that it was in the same position as the missing taillight on the vehicle driven by the suspect in the U Stop burglary.

Other LPD officers charged with investigating these crimes created a photographic lineup of possible suspects. A photograph of Sanders was included in the lineup. An officer showed Pals the lineup on March 22, 2005, and Pals identified Sanders as the party responsible for the theft at Hy-Vee.

On May 9, 2005, the State filed an information in the district court for Lancaster County in case No. CR05-308 charging Sanders with theft by shoplifting in violation of Neb. Rev. Stat. § 28-511.01 (Reissue 1995) for taking possession of goods or merchandise of the Hy-Vee located at 6919 O Street on February 27. On August 3, the State filed an information in the district court for Lancaster County in case No. CR05-584 charging Sanders with three counts of burglary under Neb. Rev. Stat. § 28-507 (Reissue 1995) for breaking and entering the respective premises of Village Market, U Stop, and Williams Cleaners.

On August 11, 2005, the State filed a motion to join the cases for trial. On August 12, Sanders filed a motion to sever the various counts in case No. CR05-584 for separate trials. After a hearing on both motions, the district court concluded that the evidence in both cases would be similar and that, "[i]f believed, it displays a series of events which are all tied together by the testimony of a witness, to whom [Sanders] admitted all four offenses." The court concluded that Sanders would not be prejudiced by having all four counts tried together and therefore consolidated the cases for trial.

Sanders filed several evidentiary motions that are relevant to this appeal. He filed a motion to suppress any evidence of identification of him by Pals, including an in-court identification, which motion the court overruled. The court also determined, after a hearing requested by Sanders, that statements made by Sanders to private citizens were made freely, voluntarily, knowingly, and intelligently and were therefore admissible at trial. Finally, during trial, Sanders orally moved to suppress evidence obtained as a result of the warrantless search of his vehicle on March 19, 2005. The court also overruled this motion.

A jury trial was held from September 14 to 22, 2005. The jury returned a verdict of guilty on all counts. A judgment was subsequently entered, and Sanders was sentenced to 1 to 3 years' imprisonment for theft by shoplifting and 2 to 3 years' imprisonment for each count of burglary.

On November 3, 2005, Sanders filed a notice of appeal in each case. However, because Sanders failed to include the required documents with the notice of appeal in case No. CR05-308, an appeal was not docketed in that case. Sanders, with the assistance

of new counsel, filed a motion for postconviction relief, claiming that he was denied effective assistance of counsel because his trial counsel failed to perfect his appeal and caused him to lose the opportunity for appellate review. On April 19, 2006, after an evidentiary hearing was held, the district court granted Sanders' request for a new direct appeal and Sanders was given 30 days from the date of the order to file a direct appeal. On May 3, Sanders filed a notice of appeal in case No. CR05-308.

The two cases have been consolidated on appeal.

### III. ASSIGNMENTS OF ERROR

Sanders alleges, consolidated and restated, that the district court erred in (1) denying his motion to suppress an in-court identification of him by Pals; (2) granting the State's motion for joinder and denying his motion to sever the cases for trial; (3) denying his motion to suppress evidence obtained as the result of a warrantless search of his vehicle; and (4) denying him effective assistance of counsel in pretrial proceedings and at trial, because (a) Sanders' trial counsel ignored the importance of whether Sanders' admissions to private citizens were voluntarily made and then, at trial, failed to object to the use of the admissions and (b) during closing arguments, trial counsel failed to object to statements of the prosecutor's opinion regarding Sanders' guilt.

### IV. ANALYSIS

#### 1. MOTION TO SUPPRESS IN-COURT IDENTIFICATION

In his first assignment of error, Sanders asserts that the district court erred in denying his motion to suppress Pals' in-court identification. In support of this assignment, Sanders argues that Pals "was unsure of his recollection of individuals he saw the night of the theft at the HyVee grocery [and that] Pals did not identify Sanders as the person taking cigarettes in the store, rather, that Sanders was in the store the night of the theft." Brief for appellant at 16. Specifically, Sanders argues that Pals had a limited view of the theft suspect and that his description of the suspect did not match his description of the second person he saw exiting Hy-Vee. Sanders also points out that Pals expressed uncertainty about the suspect's identity and recanted his initial description of the suspect by writing a letter to the police to

change details about his description. Sanders therefore asserts that under the totality of the circumstances, Pals' identification of Sanders was "unnecessarily suggestive and conducive to irreparably mistaken identification." *Id.*

### (a) Scope of Review

A trial court's ruling on a motion to suppress is to be upheld on appeal unless its findings of fact are clearly erroneous. *State v. Newman,* 250 Neb. 226, 548 N.W.2d 739 (1996). In determining whether a trial court's findings on a motion to suppress are clearly erroneous, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *Id.*

### (b) Application of Law to Facts

An identification procedure is constitutionally invalid only when it is so unnecessarily suggestive and conducive to an irreparably mistaken identification that a defendant is denied due process of law. *State v. Smith,* 269 Neb. 773, 696 N.W.2d 871 (2005). Whether identification procedures were unduly suggestive and conducive to a substantial likelihood of irreparable mistaken identification is to be determined by a consideration of the totality of the circumstances surrounding the procedures. *Id.* The factors to be considered are the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness, and the length of time between the crime and the identification. *Id.* See, also, *Neil v. Biggers,* 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).

An in-court identification may properly be received in evidence when it is independent of and untainted by illegal pretrial identification procedures. *Smith, supra.* A primary factor in determining whether an independent basis for an in-court identification exists is the opportunity afforded the witness to observe the defendant in circumstances free from taint. *Id.*

Discrepancies and errors in identification where there is an adequate foundation are matters for a jury determination. *State v. Evans,* 187 Neb. 474, 192 N.W.2d 145 (1971). A witness'

credibility and weight to be given to testimony are matters for determination and evaluation by a fact finder. *State v. Huebner*, 245 Neb. 341, 513 N.W.2d 284 (1994), *abrogated on other grounds, State v. Morris*, 251 Neb. 23, 554 N.W.2d 627 (1996).

At the hearing on Sanders' motion to suppress evidence of identification, Pals testified that during the early morning hours of February 27, 2005, he was working at the Hy-Vee at 6919 O Street. That particular store is open 24 hours a day. He testified that at approximately 4 a.m., he witnessed an individual removing cigarette cartons from a case that was positioned behind the counter of an express lane and placing the cartons into grocery bags. Pals approached the individual and asked the individual what he was doing. The individual responded that he was going to buy $500 worth of cigarettes. Pals testified that during this encounter, he was unable to see the individual's face because the individual always kept his face turned away from Pals. However, he was able to observe that the individual had no hood on, was a male, was wearing "kind of a light green or greenish type shirt and bluish type pants," and had black hair.

According to Pals, once the individual finished gathering cigarettes, he set the bags full of cigarettes on the floor of the express lane and asked Pals where the grocery carts were located. Pals directed him to the carts. After receiving Pals' directions, the individual walked toward the carts, informing Pals that he was going to do more shopping. He left the cigarettes in the express lane. Pals still did not have a chance to see the individual's face up to that point.

While the individual was out of Pals' sight, Pals attempted to watch the bags of cigarettes gathered by the suspect but also continued working. He shampooed a rug near the front of the store. He testified that no other customers were in the store at this time. He next saw the individual when he "encountered him coming from the back." Pals testified that he saw the individual walking toward him and first noticed him when he was about 10 feet away. Pals stated that at this time, the individual "seemed to have a hood on." Pals continued, "[He] looked like his clothes was [sic] pretty much covered by a coat, full-length black coat. And his hood like covered his face like that so I couldn't get too good a look." Pals subsequently clarified that the hood did not

cover the front of the individual's face, but was around his face. Pals then testified that as the individual approached, he was able to see the individual's face. He said that he got a look at the individual's face for "maybe 10, 20 seconds, I don't know, 30, whatever time it took [him] to walk [out of the store]." Pals testified that when he saw the individual, Pals was paying "[v]ery close [attention]" and the lighting in the store was "good."

After the individual exited the store, Pals noticed that the bags of cigarettes were gone. Pals quickly searched for the cigarettes, then exited the store. He asked the individual who had just exited the store where the cigarettes were. That individual responded that he did not have them. Pals testified that it was very dark out that night, but he also said that there was "a nice big light overhead in the parking lot that was lit." He saw the suspect's face, but "at quite a distance" from across the parking lot. The suspect then drove away.

After the suspect left, Pals contacted the police. When the police arrived, Pals gave a description of the suspect. Pals testified that he described the suspect to the police as being 5 feet 10 inches tall and 180 pounds. He further told the police that the suspect was "maybe in his twenties" in age, but could have been in his thirties. He initially thought that the suspect seemed to be African-American, but noted that "later I thought back and thought that wasn't accurate, so I wrote to the chief [of police] and said [the suspect] was awfully light skinned, so I could not say for sure if he was black." He said he did not remember whether the suspect had facial hair.

Pals testified that on March 22, 2005, a police officer showed him a photographic lineup containing photographs of six individuals. Pals identified Sanders in the lineup and told the police officer that Sanders was the individual whom he saw in Hy-Vee on February 27. Pals said that he had no hesitation when he identified Sanders, and when asked how sure he was that Sanders was the individual he saw in the store on the night in question, he responded, "I think close to 100 percent I think." Pals later testified that the officer who showed him the photographs did not suggest any of the photographs to Pals and did not tell him that one of the individuals in the lineup was responsible for the theft. Pals also identified Sanders at the motion to

suppress hearing. He stated that he was "100 percent" sure that Sanders was the individual he encountered in the store.

Officer Jeremy Wilhelm, an officer with the LPD, testified that on February 27, 2005, at approximately 4 a.m., he was called to the Hy-Vee store at 6919 O Street to investigate a theft. Upon his arrival, he met with Pals, and Pals gave him a description of the suspect. According to Wilhelm, Pals described the suspect as a "lighter skinned black man." He also testified that on March 22, he showed Pals a lineup with six numbered photographs on it. After doing so, he instructed Pals to, among other things, "[c]arefully review all photographs before you make any decisions. This group of photographs may or may not contain a picture of the person who committed the crime now being investigated. Keep in mind that hairstyles, beards, and moustaches may be easily changed."

Wilhelm testified that Pals identified Sanders. Wilhelm denied pointing out any photograph in particular to Pals. Wilhelm testified that he was familiar with Sanders, and Wilhelm identified him at the hearing. When asked to describe Sanders at the time of the hearing, Wilhelm described him as "[l]ight skin, black male, beard, long dark curly hair . . . . 165 to 170 [pounds]."

The district court overruled Sanders' motion to suppress Pals' identification, concluding that "the identification procedure was not 'unnecessarily suggestive and conducive to an irreparably mistaken identification.'" The court noted that although Pals had a short time to observe Sanders' face up close in the store, he had additional time to view Sanders in the well-lit parking lot. The court concluded, "There was sufficient observation of [Sanders] by Pals that the identification should be submitted to the jury for its consideration." At trial, Pals identified Sanders as the individual he saw in the Hy-Vee store on the night of the theft.

The district court's findings of fact were not clearly erroneous. There is nothing in the record indicating that the identification procedure used by Wilhelm was "unnecessarily suggestive" or "conducive to an irreparably mistaken identification." *State v. Smith*, 269 Neb. 773, 784, 696 N.W.2d 871, 882 (2005). Both Pals and Wilhelm testified that Wilhelm in no way suggested a particular photograph to Pals. Our review of the lineup reveals

nothing "unduly suggestive" about the presentation of the photographs in the lineup. See *id.*

For the sake of completeness, we also determine that Pals' in-court identification of Sanders was based on Pals' observations of the suspect on the night of the theft and there is nothing to indicate a substantial likelihood of mistaken identity. Pals testified that he saw the individual's face as he walked past Pals and that Pals was paying very close attention at this time. Approximately 1 month passed between the theft and his initial identification of Sanders.

While Pals admitted that at some point after he first described the suspect to the police, he wrote a letter to the chief of police and told him that the suspect's skin was lighter than Pals initially thought, he explained at trial that he wrote the letter to the chief not because his opinion of what he had seen changed, but because he wanted to "just add . . . more details which [he] thought were more accurate with regard to who the suspect might be." He also stated that the suspect's race was not easy to discern. This testimony is supported by Wilhelm's description of Sanders as an African-American who has light skin. Further, Pals testified that he was very certain that the person he identified in the photograph was the individual whom he saw in the Hy-Vee store on the night in question. Any questions regarding discrepancies in Pals' description were to be resolved by the jury. See *State v. Evans,* 187 Neb. 474, 192 N.W.2d 145 (1971). Further, questions about whether Pals' description indicates that more than one customer was in the store during the theft were factual matters to be resolved by the jury. See *State v. Huebner,* 245 Neb. 341, 513 N.W.2d 284 (1994), *abrogated on other grounds, State v. Morris,* 251 Neb. 23, 554 N.W.2d 627 (1996).

### (c) Resolution

Because the district court's findings were not clearly erroneous, Sanders' first assignment is without merit.

### 2. JOINDER

In his second assignment of error, Sanders asserts that the district court erred in granting the State's motion for joinder and denying his motion for severance. He argues that joinder

of the cases prejudiced him during trial. He argues specifically that "when . . . Pals testified [about the theft at Hy-Vee and placed Sanders at the Hy-Vee during the early morning hours of February 27, 2005], his testimony improperly bolstered the State's evidence of the burglaries." Brief for appellant at 21. He further argues that Pals' testimony would not have been admissible in a separate trial for the burglaries and that therefore Sanders was prejudiced when these offenses were joined for trial.

The State points out the many similarities between all of the crimes and argues that Sanders failed to establish that he was prejudiced by the joinder. The State argues that because a private citizen testified that Sanders had confessed to her that he committed all of the crimes at issue, "Pals['] identification of Sanders in no way impermissibly prejudiced Sanders." Brief for appellee at 12.

### (a) Scope of Review

A trial court's ruling on a motion for consolidation of prosecutions properly joinable will not be disturbed on appeal absent an abuse of discretion. *State v. Perry*, 268 Neb. 179, 681 N.W.2d 729 (2004). Severance is not a matter of right, and a ruling of the trial court with regard thereto will not be disturbed on appeal absent a showing of prejudice to the defendant. *State v. Mowell*, 267 Neb. 83, 672 N.W.2d 389 (2003).

### (b) Application of Law to Facts

Pursuant to Neb. Rev. Stat. § 29-2002(2) (Reissue 1995), "The court may order two or more indictments, informations, or complaints . . . to be tried together if the offenses could have been joined in a single indictment, information, or complaint . . . ." Two or more offenses may be joined in the same indictment, information, or complaint if the offenses charged are "of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." § 29-2002(1). However, "[i]f it appears that a defendant . . . would be prejudiced by a joinder of offenses . . . the court may order an election for separate trials . . . ." § 29-2002(3).

 When determining whether the offenses were properly joined, appellate courts in this state undertake a two-stage analysis. See *State v. Freeman*, 253 Neb. 385, 571 N.W.2d 276 (1997). First, the appellate court must determine whether the offenses are properly joinable under § 29-2002(1). See *State v. Dandridge*, 1 Neb. App. 786, 511 N.W.2d 527 (1993). In the instant case, all of the charges brought against Sanders are similar in nature. Three of the four charges were for stealing cigarettes. In all but one of the offenses, the perpetrator broke into a business by throwing a rock through a glass door or window. All of the offenses were part of a common scheme or plan. They all occurred during the early morning hours of February 27, 2005. A similar vehicle was identified at more than one of the crime scenes. Further, a private citizen testified that Sanders admitted to her that he committed all of the crimes he was charged with and told her that he committed them all in the early morning hours of February 27. Multiple witnesses would be called to testify at both trials had the cases been tried separately. If two or more offenses are properly joinable, courts must next determine whether joinder would be prejudicial to the defendant. See *id.* A defendant opposing joinder of charges has the burden of proving that joinder will be prejudicial to the defendant. *State v. Garza*, 256 Neb. 752, 592 N.W.2d 485 (1999). A defendant is not prejudiced by the joinder of charges where the evidence relating to both offenses would be admissible in a trial of either offense separately. *Freeman, supra*. The evidence will be admitted if it is similar to and reasonably related to the offending conduct and is presented in a manner in which the prejudice does not outweigh its probative value. *Id.*

Pursuant to Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Reissue 1995), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. Evidence of other crimes may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.* Evidence of other crimes, wrongs, or acts may be admitted where the evidence is so related in time, place, and circumstances to the offense charged as to have substantial probative

value in determining the accused's guilt of the offense in question. *State v. Timmerman*, 240 Neb. 74, 480 N.W.2d 411 (1992). It is within the discretion of the trial court to determine the admissibility of evidence of other wrongs or acts, and the trial court's decision will not be reversed absent an abuse of that discretion. *Freeman, supra.*

Sanders was not prejudiced by joinder of the two cases for trial. Sanders argues that he was prejudiced in the burglary case by Pals' identification of Sanders as the individual in the Hy-Vee store the night the crimes were perpetrated. However, we determine that Pals' identification of Sanders would have been admissible at a separate trial on the burglary charges to establish a method of operation, opportunity, and a common plan. Pals' identification of Sanders would be admissible to show that Sanders was potentially involved in a very similar crime that occurred during the same timeframe as the burglaries and would therefore have probative value. See *Timmerman, supra.*

### (c) Resolution

Because the trial court did not abuse its discretion by joining the cases for trial and Sanders was not prejudiced by joinder of the cases, this assignment is without merit.

### 3. Motion to Suppress Evidence Seized From Sanders' Vehicle

Sanders argues that the district court erred in denying his motion to suppress evidence discovered during a warrantless search of his vehicle. Sanders argues that the circumstances surrounding the search do not provide grounds for the application of an exception to the warrant requirement. He argues specifically that the officers lacked probable cause to conduct the search and that the evidence sought during the search was "not readily destroyable, thereby eliminating any reason time to obtain a warrant would impede an investigation." Brief for appellant at 26.

The State responds with two arguments. First, the State argues that Sanders waived the right to object on Fourth Amendment grounds to the admission of evidence obtained during the search. The State argues that because Sanders did not object on Fourth

Amendment grounds to testimony offered at trial that an investigating officer entered Sanders' vehicle and pressed on its brake pedal, the defense waived the right to object to the offer of any evidence discovered during the warrantless search of Sanders' vehicle. Second, the State argues that the officers had probable cause to search Sanders' vehicle.

(a) Scope of Review

A trial court's ruling on a motion to suppress, apart from determinations of reasonable suspicion to conduct investigatory stops and probable cause to perform warrantless searches, is to be upheld on appeal unless its findings of fact are clearly erroneous. In making this determination, an appellate court does not reweigh the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *State v. Scovill*, 9 Neb. App. 118, 608 N.W.2d 623 (2000). A trial court's ultimate determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search are reviewed de novo. *Id*.

(b) Application of Law to Facts

On March 19, 2005, Officers Timothy Cronin and Tracy Graham were on duty. Their shift began at 11 p.m. the previous evening and continued until 7 a.m. on the 19th. During their shift, they went to an apartment complex on Arapahoe Street (hereinafter the Arapahoe address) to execute a warrant for Sanders' arrest on charges unrelated to those at issue on this appeal. While at the Arapahoe address, they observed a vehicle that they believed was the vehicle that was being sought in connection with the U Stop burglary (the U Stop vehicle). To determine whether the vehicle was the same, Graham observed the vehicle's taillights while Cronin pressed his foot on the vehicle's brake pedal. Graham observed that one taillight was missing or burned out. It was later discovered that this vehicle belonged to Sanders.

At trial, Cronin testified that he had seen a photograph of the U Stop vehicle before he went on duty on March 18 and was therefore familiar with its characteristics. He testified that the vehicle he observed at the Arapahoe address matched the

description of the U Stop vehicle. He described the vehicle he saw at the Arapahoe address as a "Buick Somerset, or similar, taillights strung from one end to the other." He also testified that he saw in-transit stickers and packs of cigarettes lying inside the vehicle.

The prosecutor then asked Cronin how he was able to determine that the vehicle was missing a taillight, to which he responded, "I pressed the brake pedal and . . . Graham was standing behind me." Counsel for Sanders objected to this testimony on grounds that it was hearsay and violated the confrontation clause. The trial court sustained Sanders' objection and struck this testimony.

After both parties finished questioning Cronin, Sanders' counsel argued that the officers' search of Sanders' vehicle violated the Fourth Amendment and requested the court to suppress evidence discovered during the search. The court therefore interrupted the trial to hold a hearing on this issue.

At the hearing, Cronin's testimony greatly overlapped his trial testimony, although he added a few additional details. He testified that the vehicle at the Arapahoe address had "on the bottom portion of the window . . . markings as if in-transits had been there in recent time." He also noted that the vehicle's driver's-side door was not secured and was open.

At the hearing, Graham testified that she was involved in the investigation of the February 27, 2005, break-in at the U Stop and reviewed the surveillance video from that store on the night of the break-in. She said she watched the surveillance video many times in order to obtain a vehicle description. She testified that she suspected that the vehicle at the Arapahoe address was the same vehicle as the one driven by the suspect who burglarized the U Stop, because it had marks from previous in-transit stickers, the color was similar, the taillights extended across the rear of the vehicle, and it was a Buick Somerset. She testified that Cronin tapped the vehicle's brakes and that when he did this, she observed that one taillight did not light up. The position of the unlit taillight was the same as the position of the unlit taillight on the U Stop vehicle.

After this testimony, the trial court overruled Sanders' motion to suppress. The court reasoned that the officers had probable

cause to search the vehicle to determine if the taillight pattern matched the U Stop vehicle's taillight pattern.

We first conclude that Sanders did not waive his right to object to the admission of evidence discovered during the warrantless search of his vehicle. We recognize that if a party fails to make a timely objection to evidence, the party waives the right to assert on appeal prejudicial error concerning the evidence received without objection. *State v. Rodgers*, 237 Neb. 506, 466 N.W.2d 537 (1991). Objection to the admission of evidence is not timely unless it is made at the earliest opportunity after the ground for the objection becomes apparent. *Id.*

We do not agree with the State that because Sanders did not object on Fourth Amendment grounds to Cronin's testimony that he entered Sanders' vehicle and pressed his foot on the brake pedal, Sanders waived the right to object to the admission of evidence discovered during the officers' search of Sanders' vehicle. Cronin did not offer testimony regarding any evidence discovered as a result of his entry into Sanders' vehicle and the subsequent search for evidence. Therefore, there was nothing to object to at this point. Sanders orally requested that the court suppress any evidence discovered by the officers during their search of Sanders' vehicle. Sanders then objected to Graham's testimony during trial regarding what she observed after Cronin pressed the vehicle's brake pedal. Sanders had not previously waived his right to object to this testimony.

We now turn to the merits of this assignment. Sanders argues that the warrantless search of his vehicle was not justified and that evidence obtained by the State during the search should have been suppressed. The State counters that Cronin and Graham had probable cause to search the vehicle and that, therefore, evidence gathered during the warrantless search was admissible at trial.

The Fourth Amendment to the U.S. Constitution protects people against unreasonable searches and seizures by the government. The Nebraska Constitution has a similar provision. See Neb. Const. art. 1, § 7. Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions, which must be strictly confined by their justifications.

*State v. Voichahoske*, 271 Neb. 64, 709 N.W.2d 659 (2006). In the case of a search and seizure conducted without a warrant, the State has the burden of showing the applicability of one or more of the exceptions to the warrant requirement. *Id.*

> "Less rigorous requirements govern searches of automobiles, not only because of the element of mobility, but because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office. . . . One has a lesser expectation of privacy in a motor vehicle because its function is for transportation purposes and it seldom serves as one's residence or as the repository of personal effects. . . . As such, the recognized exceptions to the Fourth Amendment's warrant requirement as applied to automobiles include probable cause, exigent circumstances, consent, search incident to arrest, inventory search, and plain view."

*State v. Scovill*, 9 Neb. App. 118, 125, 608 N.W.2d 623, 630 (2000) (citations omitted), quoting *State v. Konfrst*, 251 Neb. 214, 556 N.W.2d 250 (1996).

When addressing the automobile exception, the U.S. Supreme Court has held:

> Our first cases establishing the automobile exception to the Fourth Amendment's warrant requirement were based on the automobile's "ready mobility," an exigency sufficient to excuse failure to obtain a search warrant once probable cause to conduct the search is clear. . . . More recent cases provide a further justification: the individual's reduced expectation of privacy in an automobile, owing to its pervasive regulation. . . . If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more.

*Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S. Ct. 2485, 135 L. Ed. 2d 1031 (1996) (citations omitted).

Since *Labron*, this state's appellate courts have not directly addressed whether the automobile exception allows police to search an unoccupied vehicle parked in a residential area; however, in several cases, the U.S. Court of Appeals for the Eighth Circuit has concluded that such searches are permissible under

the automobile exception. See, *U.S. v. Fladten*, 230 F.3d 1083 (8th Cir. 2000) (unoccupied vehicle in driveway); *Capraro v. Bunt*, 44 F.3d 690 (8th Cir. 1995) (truck parked in defendant's driveway). In light of these decisions, we conclude that the automobile exception applies in the instant case. Sanders' vehicle was readily mobile. The officers' search was permissible under the Fourth Amendment even though they did not have a search warrant, as long as the officers had probable cause to believe that the search would uncover evidence of a crime.

■ Probable cause means a fair probability that contraband or evidence of a crime will be found. *Konfrst, supra.* While probable cause escapes precise definition, we determine probable cause by an objective standard of reasonableness: whether the known facts and circumstances are sufficient to warrant a person of reasonable prudence in the belief that contraband or evidence of crime will be found. *State v. Voichahoske*, 271 Neb. 64, 709 N.W.2d 659 (2006).

The officers had probable cause to enter the vehicle in question to investigate whether all of its taillights were working. Cronin and Graham testified that Sanders' vehicle captured their attention because it looked very similar to the vehicle involved in the burglary at the U Stop. Sanders' vehicle and the U Stop vehicle shared many similar traits. Several very distinctive characteristics linked the two vehicles: (1) They both had taillights extending across the rear of the vehicle, and (2) the U Stop vehicle had an in-transit sticker on its back window and Sanders' vehicle had marks on its windows indicating that in-transit stickers had been recently removed and had in-transit stickers lying inside it. Further, Cronin testified that from looking through the window of Sanders' vehicle, he saw packs of cigarettes. At least one pack he saw was a brand of cigarettes that had been stolen from the U Stop. These facts and circumstances were sufficient to warrant a person of reasonable prudence in the belief that contraband or evidence of crime would be found in Sanders' vehicle. See *Voichahoske, supra.*

We also recall that the driver's-side door to Sanders' vehicle was unlocked and was in fact open approximately 1 inch. This fact reinforces our conclusion that the officers did not need a search warrant to enter the vehicle. Sanders' failure to secure

his vehicle further diminished any expectation of privacy he may have had relating to his vehicle. See *U.S. v. Gillis*, 358 F.3d 386 (6th Cir. 2004) (no reasonable expectation of privacy in vehicle that was unlocked and missing several windows).

### (c) Resolution

Because the officers had probable cause to believe that evidence of a crime would be found in Sanders' vehicle, this assignment of error is without merit.

### 4. INEFFECTIVE ASSISTANCE OF COUNSEL

In his final assignment of error, Sanders argues that because his trial counsel failed to properly address whether incriminating statements made by Sanders to private citizens were voluntary and, during closing arguments, failed to object to the prosecutor's statements of opinion regarding Sanders' guilt, Sanders was denied effective assistance of counsel.

### (a) Scope of Review

■ Appellate review of a claim of ineffective assistance of counsel is a mixed question of law and fact. When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error. Concerning questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), an appellate court reviews such legal determinations independently of the lower court's decision. *State v. Williams*, 269 Neb. 917, 697 N.W.2d 273 (2005).

### (b) Application of Law to Facts

■ Claims of ineffective assistance of counsel raised for the first time on direct appeal do not require dismissal ipso facto; the determining factor is whether the record is sufficient to adequately review the question. When the issue has not been raised or ruled on at the trial court level and the matter necessitates an evidentiary hearing, an appellate court will not address the matter on direct appeal. *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006). In this case, the record is sufficient for us to adequately review this assignment.

 To state a claim of ineffective assistance of counsel under *Strickland, supra,* and demonstrate that a conviction must be overturned, a defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense. *State v. Nesbitt,* 264 Neb. 612, 650 N.W.2d 766 (2002). These two prongs may be addressed in either order, but if it is more appropriate to dispose of an ineffectiveness claim due to the lack of sufficient prejudice, that course should be followed. See *id.* For purposes of this appeal, we assume without deciding that Sanders' counsel's performance was deficient and therefore dispose of this assignment by determining whether Sanders was prejudiced by his counsel's performance.

 To prove prejudice for a claim of ineffective assistance of counsel, the defendant must show there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *State v. Moyer,* 271 Neb. 776, 715 N.W.2d 565 (2006). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

### (i) Voluntariness of Sanders' Statements

On September 9, 2005, at a pretrial hearing, Sanders' counsel orally requested a hearing on whether statements made by Sanders to private citizens were voluntary. A hearing was held on the same day. At the hearing, Tammy Alt testified that on June 7, Sanders made comments to her about "places he had robbed" and told her that that he stole cigarettes. She stated that he "appeared to be drunk" and that "it seemed like he was disoriented in some way." Alice Williams testified that Sanders discussed the Hy-Vee theft with her on two separate occasions. According to Alice, Sanders made comments that "they couldn't prove anything because the clerk that identified him identified him as a Hispanic male . . . . And the clerk was . . . old." Brittany Williams testified that Sanders admitted to her during various conversations he committed all of the crimes he was charged with and that he told her details regarding all four crimes, including that he was driving his Buick Somerset when he committed these crimes.

All of the private citizens were asked by the prosecutor whether, at the time Sanders made incriminating statements, the citizens threatened Sanders or made promises in order to get him to make the statements. Each denied making any threats or promises. Brittany and Alice testified that they did not coerce Sanders into making the statements. Brittany testified that Sanders made the statements voluntarily, freely, and intelligently and seemed to know what he was saying. Alice testified that Sanders understood the conversations when he made the statements. She testified that while he was confused and "[i]n and out" during one conversation, he was consistent when he talked about the Hy-Vee theft.

On cross-examination, Sanders' counsel did not ask these witnesses their opinions regarding Sanders' mental state and did not investigate whether Sanders' mental state affected whether these statements were voluntarily given. He failed to do this despite the fact that Alice and Brittany testified that Sanders was in a mental health facility when he made some of the incriminating statements. The court ruled that Sanders voluntarily made all of the statements.

Sanders argues that his trial counsel dodged the purpose of the hearing by failing to question the witnesses on the issue of Sanders' mental health commitment and that his trial counsel failed to object to the use of Sanders' statements at trial. According to Sanders, these mistakes prejudiced his defense. When questioned by the judge, Sanders' counsel stated that it was not the defense's theory that statements made by Sanders while he was in a mental health center were not voluntary.

■ On questioned voluntariness, an accused's statement, whether an admission or a confession, made to private citizens, as well as to law enforcement personnel, must be voluntary as determined by a court for admissibility and as a fact ascertained by the jury. *State v. Kula*, 260 Neb. 183, 616 N.W.2d 313 (2000).

■ To meet the requirement that a defendant's statement, admission, or confession was made freely and voluntarily, the evidence must show that such statement, admission, or confession was not the product of any promise or inducement—direct, indirect, or implied—no matter how slight. *State v. Melton*,

239 Neb. 790, 478 N.W.2d 341 (1992). Whether a confession, statement, or admission was made knowingly, intelligently, and voluntarily depends on the totality of the circumstances. *State v. Johnson*, 242 Neb. 924, 497 N.W.2d 28 (1993). A preliminary determination by the trial court that a statement was made voluntarily will not be disturbed on appeal unless clearly wrong. *State v. Phelps*, 241 Neb. 707, 490 N.W.2d 676 (1992).

 The mere fact of intoxication is not conclusive on the issue of voluntariness of a statement or a consent given by a defendant. *Melton, supra.* A defendant must be so intoxicated that he is unable to understand the meaning of his statements. *Id.*

 Mental illness, like age, education, and intelligence, is a relevant factor in the totality test. *State v. Dickson*, 223 Neb. 397, 389 N.W.2d 785 (1986). However, no per se rule invalidates the volunteered statement of a mentally ill defendant. *Id.* Such statements are subject to the general rule that a statement freely and voluntarily given without any compelling influences is admissible. *Id.*

In the instant case, even if Sanders' counsel had more aggressively challenged the voluntary nature of Sanders' statements and objected to their admission at trial, there is no reasonable probability that the district court would have determined that these statements were involuntarily made and would have therefore excluded them. See, *State v. Smith*, 269 Neb. 773, 696 N.W.2d 871 (2005); *State v. Tucker*, 257 Neb. 496, 598 N.W.2d 742 (1999). During the hearing, each witness testified that she did not coerce or threaten Sanders in order to compel him to make incriminating statements, or make any promises in exchange for the statements. The circumstances surrounding the admissions do not indicate that they were anything but voluntarily made. Further, while Alt testified that Sanders appeared drunk and seemed mentally confused when he spoke to her about the burglaries, nothing in the record indicates that Sanders was so intoxicated that he was unable to understand the meaning of his statements, and Alt noted that Sanders was consistent when talking about the Hy-Vee theft. After considering the totality of the circumstances, we conclude that Sanders was not prejudiced by his trial counsel's performance.

### (ii) Prosecutor's Statements of Opinion

In the course of the prosecutor's rebuttal during closing arguments, the prosecutor stated, "The burden of proof is on the State. And the State accepts that. And I believe the State has met that in all these charges." The prosecutor also used the phrase "I submit to you" several times during her rebuttal. Sanders argues that his counsel's failure to object to these statements and request a mistrial prejudiced him.

 It is highly improper and generally prejudicial for a prosecuting attorney in a criminal case to declare to the jury his or her personal belief in the guilt of the defendant, unless such belief is given as a deduction from evidence. See *State v. Myers*, 244 Neb. 905, 510 N.W.2d 58 (1994), *overruled in part on other grounds, State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998). The remarks of a prosecutor in his or her closing argument which do not mislead and unduly influence the jury and thereby prejudice the rights of the defendant do not constitute misconduct. See *State v. LeBron*, 217 Neb. 452, 349 N.W.2d 918 (1984).

In the instant case, we determine that the prosecutor's statements were conclusions that were predicated upon the evidence. While the prosecutor couched her statements in terms of her beliefs, she was merely making deductions from the evidence. We further find that there is no evidence in the record that her statements misled or unduly influenced the jury. There was ample evidence of Sanders' guilt presented during trial, and the trial court instructed the jury that statements made by attorneys were not to be considered as evidence.

### (c) Resolution

Because we conclude that Sanders was not prejudiced by any alleged misconduct by his counsel, this assignment is without merit.

## V. CONCLUSION

For the foregoing reasons, we conclude that Sanders' assignments of error lack merit, and we therefore affirm.

AFFIRMED.